# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-2027V
UNPUBLISHED

| | |
|---|---|
| DRUSILLA PEARSON,<br><br>                   Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                   Respondent. | Chief Special Master Corcoran<br><br>Filed: April 25, 2025 |

*Courtney Christine Jorgenson,* Siri & Glimstad, LLP, Phoenix, AZ, for Petitioner.

*Katherine Carr Esposito,* U.S. Department of Justice, Washington, DC, for Respondent.

### (I) FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM AND (II) ORDER TO SHOW CAUSE[1]

On October 15, 2021, Drusilla Pearson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a Table injury – shoulder injury related to vaccine administration ("SIRVA") – as a result of an influenza ("flu") vaccine she received on October 16, 2018. Petition, ECF No. 1 at 1, 3. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet**. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons stated below, I conclude that Petitioner has not established by preponderant evidence that the onset of her shoulder pain likely occurred within 48 hours of vaccination, as required to establish a Table SIRVA claim. In addition, the evidence strongly is unsupportive of *any* causation-in-fact claim as well, and therefore Petitioner must Show Cause why the matter should not be dismissed in its entirety.

## I.     Relevant Procedural History

In September 2022, I observed that based upon my preliminary review of the records in this case, it appeared that Petitioner could not establish that she suffered shoulder pain within 48 hours of her vaccination – one of the four QAI requirements necessary to demonstrate a Table SIRVA claim. ECF No. 16 (citing Ex. 6 at 256; 42 C.F.R. § 100.3(c)(10)(ii)). Thereafter, Petitioner was provided time to supplement the record with additional evidence documenting the onset of her injury. Subsequent to filing additional medical records, and sworn statements from five witnesses, Petitioner filed a Brief Addressing Onset on May 16, 2023, and arguing that this Table element can be met. ECF No. 30.

On June 15, 2023, Respondent filed his Rule 4(c) Report and Response to Petitioner's Brief Regarding Onset. ECF No. 31. Respondent contends that Petitioner has failed to establish that she suffered shoulder pain within 48 hours of her vaccination, meaning she cannot prevail on a Table SIRVA. *Id.* at 13-18. Respondent further argues that Petitioner has failed to demonstrate an off-Table claim under the applicable legal standard and therefore her claim must be dismissed. *Id.* at 18-21. Finally, Respondent asserts that Petitioner has failed to demonstrate a reasonable basis for her claim, and states that he will challenge any request by Petitioner for fees and costs in this case. *Id.* at 20. On July 17, 2023, Petitioner filed a Reply brief. ECF No. 32. This matter is now ripe for adjudication.

## II.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally

2

contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. Section 11(c)(1)(A)(B)(D)(E).

4

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### III. Finding of Fact

I make these findings after a complete review of the record, including all medical records, declarations, Respondent's Rule 4 Report, the parties' arguments, and additional evidence filed.

#### A. Medical Records

- On October 16, 2018, Petitioner at the age of 70 received in her left arm a flu vaccine at Costco Pharmacy. Ex. 7 at 12-13; Ex. 15 at 334.

- Approximately three weeks later, on November 7, 2018, Petitioner was seen by an ENT physician for an evaluation of allergies and tinnitus. Ex. 2 at 335; Ex. 15 at 349-350. Petitioner did not report any shoulder pain at this visit.

- One month after her vaccination, on November 15, 2018, Petitioner was seen at the office of her primary care provider ("PCP"), Darren P. Hee, MD. Ex. 2 at 281-84; Ex. 15 at 336-39. Petitioner's diagnoses for this visit included acute sinusitis, hypertension, seasonal allergies, and anxiety. Ex. 2 at 283; Ex. 15 at 339-40.

- On November 21, 2018, Petitioner underwent a mammogram. Ex. 15 at 335.

- Petitioner messaged Dr. Hee on December 19, 2018, requesting a prescription cream to treat a rash on her legs that occurred while walking long distances in hot and humid weather. Ex. 15 at 331. Petitioner raised no concerns regarding shoulder pain in this message.

- On January 4, 2019, Petitioner was seen again at her PCP's office. She was assessed with hypertension and acute sinusitis. Ex. 2 at 279; Ex. 15 at 323-29. The record from this visit contains no report of shoulder pain.

- On January 17, 2019, Petitioner was seen by her ENT for allergy testing. Ex. 15 at 317.

- Petitioner was next seen by Dr. Hee on February 11, 2019 for a follow-up visit. Ex. 2 at 275; Ex. 15 at 314-15. Petitioner's history included a discussion of her allergies, tinnitus issues, medications, smoking history and desire for lung screening, and need for preventive medications in consideration of her coronary artery disease and diabetes mellitus. Ex. 15 at 314. The record contains no report of shoulder pain.

- Four days later, on February 15, 2019, Petitioner messaged Dr. Hee to discuss lung screening results and diagnosis of pulmonary emphysema. Ex. 15 at 310. Petitioner raised no concerns regarding shoulder pain in this message.

- Thereafter, on February 20, 2019, Petitioner messaged Dr. Hee with medication questions and concerns in follow-up to her laboratory testing. Ex. 15 at 301. In follow-up, Petitioner was referred to an endocrinologist on February 21, 2019. *Id.* at 298, 301.

- On March 15, 2019, messaged Dr. Hee regarding another possible sinus infection. Ex. 15 at 283-84.

- On March 25, 2019, Petitioner was seen by an endocrinologist, Dorota Pucyk, for a consultation regarding her hypothyroidism. Petitioner's hypothyroidism, weight gain, diabetes, hyperlipidemia, and muscle cramping were addressed at this visit. Ex. 2 at 331-32; Ex. 15 at 275-78. The record notes under a musculoskeletal symptom review that Petitioner had "[n]ew joint pain" but contains no report of any shoulder pain. Ex. 2 at 333.

6

- On April 1 and 2, 2019, Petitioner messaged Dr. Hee and Dr. Pucyk questions regarding her diabetes medication. Ex. 15 at 269-72.

- On April 18, 2019, Petitioner established care with cardiologist Rajesh Janardhanan, MD. Ex. 15 at 264-65.

- On April 29, 2019, Petitioner underwent an echocardiogram study. Ex. 15 at 261-62.

- On May 23, 2019, Petitioner was seen again by Dr. Hee with complaints of a one-week cough. Ex. 15 at 252-54. Petitioner was assessed with a cough, allergies, and hypertension. Ex. 2 at 267; Ex. 15 at 252. The record contains no report of any shoulder pain.

- Petitioner was again seen by Dr. Hee on May 28, 2019 for a follow-up on her blood pressure and with concerns regarding sinusitis and tinnitus. Ex. 15 at 234.

- Between May 28, 2019 and June 6, 2019, Petitioner engaged in messaging with Dr. Hee (regarding her Bystolic prescription) and Dr. Puyk regarding laboratory tests. Ex. 15 at 227-31.

- Petitioner was again seen by Dr. Hee for a comprehensive Medicare annual wellness examination on June 26, 2019. Ex. 15 at 210-216; *see also* Ex. 2 at 260-61. Petitioner underwent a physical examination at this appointment that included a musculoskeletal examination with multiple findings specific to a diabetic foot examination. Ex. 15 at 212. Dr. Hee detailed a history that included: resolution of Petitioner's tinnitus, Petitioner's daily calorie intake and weekly exercise regimen, a notation that her asthma was controlled well, and a discussion of biannual mammograms. *Id.* at 211. Petitioner's visit assessments included, but were not limited to: asthma, hypertension, obesity, hypothyroidism, and diabetes. *Id.* at 210. There is no indication in the record that Petitioner suffered from, reported, or exhibited any shoulder pain.

- On September 29, 2019, Petitioner messaged Dr. Hee regarding fasting instructions in advance of her blood tests scheduled for October 2019 in preparation for her November 5, 2019 appointment, and requested that her mammogram order be sent to a specific radiologist. Ex. 15 at 205-06.

7

- On November 5, 2019 (now more than one year after the vaccination at issue), Petitioner was seen again by Dr. Hee for a follow-up appointment and to discuss her medication. Ex. 15 at 195-97. The history provided in this record states, in addition to a discussion of other medical concerns, "left shoulder pain since flu shot. Diclofenac cream helps but increased pain with swimming. Pain with elevation of the left shoulder." *Id.* at 196. Petitioner was assessed with "subcoracoid impingement of left shoulder" in addition to other conditions. Ex. 15 at 195.

- Thereafter, on November 9-12, 2019, Petitioner messaged Dr. Hee regarding certain prescription requests (including a renewal for diclofenac sodium topical gel). Ex. 15 at 190-92. Petitioner did not report or discuss any shoulder pain in her messages.

- Subsequently, Petitioner was seen by and/or messaged various medical providers on numerous occasions in *the nineteen month period* between November 19, 2019 and June 30, 2021, including Dr. Hee, but did not seek any treatment for her left shoulder. *See, e.g.,* Ex. 2 at 5, Ex. 15 at 559 (November 19, 2019: annual flu vaccination received); Ex. 2 at 330 (December 2, 2019: mammogram); Ex. 2 at 247-251 (January 16 - 24, 2020: messaging with Dr. Hee); Ex. 2 at 245 (February 7, 2020: message to Dr. Hee); Ex. 2 at 232 (March 3, 2020: visit with Dr. Hee); Ex. 2 at 230 (March 5, 2020: message to Dr. Hee); Ex. 2 at 228-29 (April 3, 2020: message to Dr. Hee); Ex. 2 at 224-26 (May 14 and 18, 2020: messaging with Dr. Hee); Ex. 2 at 217, 220 (July 12-14 messaging with Dr. Hee); Ex. 2 at 207, 218 (July 16, 2020: sinus CT conducted) Ex. 2 at 204 (July 28, 2020: visit with Dr. Hee for a comprehensive Medicare annual wellness examination); Ex. 2 at 326 (August 12, 2020: ENT visit); Ex. 2 at 200 (August 12, 2020: message to Dr. Hee); ) Ex. 2 at 198 (August 19, 2020: message to Dr. Hee's office); Ex. 2 at 191-93 (August 25, 2020: visit with Dr. Hee's office); Ex. 2 at 324 (October 30, 2020: dermatologist visit); Ex. 2 at 181 – 85 (October 30 – November 3, 2020 (messaging with Dr. Hee); Ex. 2 at 174 (November 4, 2020: visit with Dr. Hee); Ex. 2 at 187-88 (November 5, 2020: renal ultrasound); Ex. 2 at 320 (December 22, 2020: telemed visit with nephrologist for renal insufficiency); Ex. 2 at 317-18 (12/30/2020: renal artery ultrasound); Ex. 2 at 316 (January 25, 2021: mammogram); Ex. 2 at 157, 159 (February 1 and 8, 2021: messaging with Dr. Hee); Ex. 2 at 154-55 (February 14-15, 2021: messaging with Dr. Hee); Ex. 2 at 311 (February 23, 2021 nephrologist visit); Ex. 2 at 147 (March 4, 2021: visit with Dr. Hee); Ex. 2 at 145, 143 (March 15-16, 2021: messages to Dr. Hee); Ex. 2 at 132-

> 34 (May 6, 2021: telephone encounter with Dr. Hee's office); Ex. 3 at 4-6 (May 19, 2021: cardiologist visit); Ex. 3 at 2-3 (June 1, 2021: cardiologist visit); Ex. 2 at 91 (June 8, 2021: visit with Dr. Hee's office); Ex. 2 at 60 (June 30, 2021: labwork performed).

- On July 8, 2021, at an annual wellness visit with Dr. Hee, Petitioner now reported "[c]onstant left arm pain. She has pain lying in the left side. She has pain with movement." Ex. 2 at 41. Petitioner's musculoskeletal examination comments state "[d]ecreased extension of the left shoulder and pain with crossover, apprehension sign and supraspinatus/infraspinatus testing." *Id.* at 46. Petitioner's diagnoses for this visit includes "[i]mpingment syndrome of left shoulder region" with a plan to treat with physical therapy in the future *Id.* at 47-48.

- On July 12, 2021, Petitioner messaged her nephrologist's office in regard to her June 30, 2021 GFR levels and mentioned that in June she had "ate all the wrong things plus used aspirin for an aching arm." Ex. 4 at 19.

- On July 14, 2021, Petitioner presented for an initial physical therapy evaluation. Ex. 6 at 5. This record records a history or "Mechanism of Injury" as "P[atien]t had a flu[] shot and that night she woke up in excruciating pain in the left shoulder. This happened about 3 years ago and shoulder has not gotten better. Shoulder has gotten progressively worse and now she [h]as sharp pain and aching in the shoulder with difficulty using the arm. Insidious onset." *Id.*

- Thereafter, Petitioner continued to treat her left shoulder pain (which she associated with her 2018 flu vaccination) in addition to her other medical conditions.

### B. Other Evidence – Declarations filed by Petitioner

Petitioner submitted her own sworn declaration, and an additional five sworn declarations from her domestic partner, and four friends, in support of her claim. Exs. 1, 8-12. In her own declaration dated October 14, 2021, Petitioner states that upon receiving the flu vaccine on October 16, 2018 at Costco Pharmacy "it felt as though the technician had inserted the needle into my bone. I winced and almost cried out" and she complained to the technician who assured her she would be okay in a few hours. Ex. 1 at 1. Petitioner states she awoke that night in "excruciating pain" and feared a heart attack. *Id.* She states

9

"[o]ver the next few months, I just tried to live with the pain, all the while thinking it would get better. It never did." *Id*. Thereafter, she states that "[o]n November 5, 2019, I had a visit with Dr. Hee. He addressed, although inadequately, my shoulder and arm pain." *Id*. at 2. Petitioner's declaration discussed the impact her shoulder pain has had upon her activities of daily living, including exercising and traveling to visit her grandchildren. *Id.* Petitioner states that her "constant complaints" to her PCP finally resulted in xrays and a referral to a physical therapist. *Id.* However, Petitioner's declaration does not mention any complaints to her PCP, or any other medical provider, other than to Dr. Hee on November 5, 2019.

Petitioner filed a sworn declaration from David Pinney, dated March 27, 2023. Ex. 12. Mr. Pinney states that he lives with Petitioner, who has been his domestic partner since 2008. *Id.* at 1. Mr. Pinney recalls that the day of Petitioner's flu shot, October 16, 2018, she complained "it felt like the technician had hit a wrong spot or hit a nerve" and that Petitioner told him "she felt pain immediately." *Id.* He states the next day when she "was lying in bed she said the pain made it feel like she was having a heart attack." *Id.* Thereafter, he states that Petitioner "noticed she was having difficulty lifting her arm above the shoulder. She felt pain whenever she tried to lift anything." *Id.*

Anne Browning-Aiken provided a sworn statement dated December 7, 2022. Ex. 8. Ms. Browning-Aiken a long-term friend of Petitioner states that she "think[s] the first time [Petitioner] shared with me that something was wrong with her arm after the vaccination was by email. To my best recollection, it was within a week of her getting the vaccination." *Id.* Ms. Browning-Aiken also states that on her birthday, November 20th, "Petitioner just wasn't herself that year" and told her that "she could not understand why her arm had not gotten better." *Id.* at 1. Ms. Browning-Aiken states that Petitioner has "complained about her arm since that time." *Id.*

Petitioner filed a sworn declaration from Baruch Burstein who participated in the same exercise classes with Petitioner. Ex. 9. Mr. Burstein states that Petitioner told him "about her injury caused by the flu shot (although I don't remember the exact date she told me). This was several years ago now. She told me she had left shoulder pain." *Id.* Mr. Baruch notes that Petitioner still complains of pain sometimes. *Id.* at 2.

Petitioner filed a sworn affidavit from Wain Cooper, dated December 12, 2022, who states he knows Petitioner through his wife, who took exercise classes with Petitioner four or more years ago. He states that when they socialized with Petitioner "after she got her vaccination, she explained the pain she was having in her shoulder." Ex. 10. He states Petitioner described things that she couldn't do anymore such as exercise "and she told us it happened to her because of her flu shot." *Id.*

Finally, Petitioner filed a sworn declaration from Daniel Aiken dated December 12, 2022. Ex. 11. Mr. Aiken states that he and his wife are long-term friends with Petitioner

10

and that he became aware of her left shoulder problem "a number of years ago". *Id.* He states that Petitioner told them about her "chronic left shoulder pain, and how uncomfortable this was for her. She told us she thought it was from the flu shot, and the pain started after the shot was given too high on her arm. As time went on her pain did not go away." *Id.*

### C. Petitioner Cannot Meet the Table Onset Requirement for a SIRVA

On balance, and despite Petitioner's efforts to offer witness statements consistent with her allegations, the evidence in this case preponderates strongly *against* a finding that Petitioner suffered the onset of her shoulder pain within 48 hours following the administration of her October 16, 2018 flu vaccine.

Most significant to my determination is the fact that contemporaneous medical records do not document *any* report of shoulder pain from Petitioner until over one year after her vaccination. During this time period, Petitioner was seen for *numerous* medical visits, including six visits to her PCP, Dr. Hee, or his office. *See supra* at pp. 5-7. However, neither Dr. Hee nor any of Petitioner's other providers documented any report that Petitioner experienced shoulder or arm pain. Additionally, Petitioner engaged in electronic messaging with Dr. Hee or his office on at least seven occasions and never raised any concerns regarding her shoulder pain in any of these messages. *See supra* at pp. 6-7.

During this time period Petitioner sought care with various specialists such as an ENT, and a cardiologist, but sought no care for her shoulder. While it is reasonable that Petitioner would not report shoulder pain to a specialist seen for another condition, the record supports the conclusion that she could have seen an appropriate treater (and likely would have if the problem had in fact been significant enough). Petitioner's many visits during the year following her 2018 vaccination with both her PCP, and various specialists, demonstrate that she is not a person who avoids seeking medical care. Rather the record in this case demonstrates that Petitioner promptly seeks care for both acute, and chronic conditions.

Petitioner in her brief argues that she "spoke about her shoulder with her provider multiple times before this date [November 5, 2019]. She is not sure why this is not documented on the medical chart." ECF No. 30 at 3, n. 1. However, this argument is not supported by the record. Petitioner's declaration fails to describe or mention *any* report or complaint to Dr. Hee, or any other provider, of shoulder pain made before her November 5, 2019 complaint to Dr. Hee. Nor does Petitioner provide any explanation in her declaration for why she delayed reporting her shoulder pain to a medical professional, or otherwise seek treatment or care for her shoulder.

Although the declarations filed in support of Petitioner's claim offer *some* support for her allegation of immediate onset, they are not compelling evidence for multiple reasons. First, the declarations (except for Petitioner's own statement[4]) were all dated over four years after the alleged onset of Petitioner's shoulder pain. None of the declarants, aside from Petitioner's domestic partner, recall Petitioner reporting shoulder pain to them on a specific date. Although, Ms. Browning-Aiken recalls "to the best of her recollection" Petitioner emailed her within a week of getting her vaccination to share that something was wrong – neither Petitioner, nor Ms. Browning-Aiken, submitted a copy of the purported email.[5] These vague statements, offered many years after Petitioner's vaccination, simply fail to outweigh the lack of documentation in the *many* contemporaneous medical records filed in the year following Petitioner's October 2018 flu vaccination.

Ultimately, the medical records, witness statements and other evidence offered[6] in this case do not preponderantly support a Table SIRVA onset. Although after-the-fact statements can sometimes be deemed persuasive when consistent and compelling, the declarations submitted in this matter do not alone preponderantly establish immediate onset in a case where the numerous contemporaneous medical records are silent. Although the standard applied to SIRVA claims on the onset issue is fairly liberal, not every SIRVA claim can be so preponderantly established, and especially not where the

---

[4] Petitioner's sworn statement is dated October 14, 2022, nearly three years after her October 16, 2018 flu vaccination. Ex. 1.

[5] In other SIRVA cases, I have found copies of emails and/or text messages mentioning a Petitioner's shoulder pain as persuasive evidence supporting a Petitioner allegation of onset. *See, e.g., Underwood v. Sec'y of Health & Hum. Servs.*, No. 20-404V, 2023 WL 1778189, at *5 (Fed. Cl. Spec. Mstr. Feb. 6, 2023)(noting the "contemporaneous email correspondence between Petitioner and her daughter are consistent with her allegations about onset" in a SIRVA claim where Petitioner filed email correspondence with her daughter from "*the day following her vaccination* indicating that her arm was a little sore," and also describing subsequent email correspondence between the petitioner and her daughter demonstrating their "ongoing concerns in regard to her arm pain.")(emphasis in original).

[6] Petitioner's brief points to her use of Diclofenac gel as evidenced by her Walmart Pharmacy records (Ex. 13) in an attempt to support her claim. As Petitioner acknowledges, however, she was prescribed Diclofenac *before her vaccination* to treat another condition. ECF No. 30 at 11-12. She reported to Dr. Hee on November 5, 2019 that the prescription gel helped her shoulder pain. Ex. 15 at 196. Subsequently, Petitioner's nephrology record from December 22, 2020 states that Petitioner "used diclofenac gel for years [but] has stopped [as of] 12/20, [and] now uses CBD oil" to treat her arthritis. Ex. 2 at 320. But Petitioner's report to Dr. Hee on November 5, 2019 that Diclofenac helped her shoulder pain, provides no support for her allegation that she suffered the onset of her shoulder pain beginning within 48 hours of her October 2018 vaccination – nor does Petitioner's continued use of the gel after her November 2019 appointment with Dr. Hee.

contemporaneous medical record contradicts a petitioner's allegations.[7] Such is the case here: where the *voluminous* medical record consistently fails to document *any* shoulder pain for over a year following her October 16, 2018 flu vaccination.

**Petitioner has not preponderantly established that the onset of her shoulder pain occurred within 48 hours of vaccination. Accordingly, Petitioner cannot proceed in this action with her Table SIRVA claim, and it is hereby dismissed.**

### IV.   Order to Show Cause

The Petition asserts an alternative claim that Petitioner's shoulder injury was caused in fact by the same vaccination. In order to prevail on a causation in fact claim, Petitioner must establish the *Althen* factors. *See Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005) (setting out a three part test for causation in fact claims, requiring that a petitioner establish (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury).

Here, the same general onset questions that required dismissal of the Table claim also seem to likely mean that a non-Table version of the claim would not be tenable. The record demonstrates that Petitioner sought no treatment for her alleged shoulder injury for *over a year* following her October 2018 vaccination, despite seeking medical care on many occasions during the relevant time period. And other than as contained in witness statements, there is no intervening objective evidence from that one-year time period of any shoulder issues at all.

Give such facts, it is *very unlikely* that Petitioner can demonstrate that *any* vaccine injury occurred in a medically-acceptable timeframe, when measured from the date of vaccination as required under prong three of *Althen*. There is, simply, an *absence* of record proof of any vaccine-related concern for too long after the vaccination – and this would be so even were I to find that Petitioner's onset occurred closer in time to vaccination. Vaccine Act claimants cannot prevail by associating an injury with a vaccine administered at a remote time in the past – since the passage of time inevitably suggests that the potential "medically-acceptable" relationship between vaccination and injury may decline. As Judge Bruggink observed in *Hennessey v. Sec'y of Health & Human Servs.*,

---

[7] *See, e.g., Shoemaker v. Sec'y of Health & Human Servs.*, No. 20-625V, 2022 WL 2288698 (Fed. Cl. Spec. Mstr. Jan. 18, 2022), *mot. for rev. denied*, 150 Fed. Cl. 307 (2022) (dismissing claim where the petitioner alleged immediate shoulder pain but did not seek care until almost ten months after vaccination).

91 Fed. Cl. 126 (2010), there are some proposed timeframes that are so long that all concepts of medical reasonableness and acceptability fly out the window. *Hennessey*, 91 Fed. Cl. at 142 ("this theory accounts for symptoms which do not occur until years after vaccination, exacerbated by some other environmental trigger... [under this theory] it would be virtually impossible to determine that the vaccine, and not some other environmental condition, was the original triggering event").

However, despite such well-reasoned skepticism for any non-Table claim's value, I will allow Petitioner a final opportunity to provide additional argument on this issue. To assuage my concerns, Petitioner must demonstrate that the exceedingly-long gap between her vaccination and first record complaint of shoulder issues would not cause her to run afoul of the third *Althen* prong. She should, if possible, cite to prior Program determinations where Petitioners have prevailed under comparable circumstances.

Petitioner is cautioned that if she fails to demonstrate entitlement, I may find that her claim lacks a reasonable basis (for the reasons discussed above), and that she is not entitled to an award of attorneys' fees and costs. It is important that Petitioner take seriously the chance I am providing her to substantiate her claim. It is a petitioner's obligation to follow court orders and to provide the evidence to support her claim. Failure to follow court orders, as well as failure to file the medical records and other evidence to support her claim, may result in dismissal of Petitioner's claim. *Tsekouras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 439 (1992), *aff'd*, 991 F.2d 810 (Fed. Cir. 1993) (per curiam); *Sapharas v. Sec'y of Health & Hum. Servs.*, 35 Fed. Cl. 503 (1996); Vaccine Rule 21(c).

Because of the factual deficiencies discussed herein, Petitioner should strongly consider seeking dismissal of this case, given the risk of an adverse reasonable basis finding. In the event that Petitioner decides not to pursue the petition further, Petitioner is advised to consult with Section IX of the Vaccine Guidelines for guidance on the appropriate motion or stipulation to file to exit the vaccine program. The Guidelines may be found at: https://www.uscfc.uscourts.gov/guidelines-practice-under-national-vaccine-injury-compensation-program

## Conclusion

**The Table SIRVA claim alleged in this Petition is dismissed; and**

**Petitioner shall show cause why this Petition should not be dismissed in its entirety for insufficient evidence by Tuesday, May 27, 2025.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
